Daniel R. Shaw (SB No. 281387)
daniel@shawfirm.com
**Shaw Firm**
3196 S. Higuera St. Suite E
San Luis Obispo, CA 93401
Telephone: (805) 439-4646
Facsimile: (805) 301-8030

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.W., a developmentally disabled adult; by and through her guardian ad litem Sandra Drumonde,<br><br>Plaintiff,<br><br>v.<br><br>Turlock Unified School District,<br><br>Defendants. | Case No.: TBD<br><br>**COMPLAINT FOR RELIEF UNDER:**<br><br>**1) Section 504 of the Rehabilitation Act of 1973**<br><br>**2) Americans with Disabilities Act**<br><br>**JURY DEMAND** |

Plaintiff S.W., by and through her guardian ad litem Sandra Drumonde, allege as follows:

**JURISDICTION AND VENUE**

1.      This is a civil action which this Court has original subject matter pursuant to 28 U.S.C. § 1331 as the actions arise under the following laws of the United States: Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

2.      Venue in this Court is proper under 20 U.S.C. 1391(b) because the Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

///

1

## PARTIES

3. Plaintiff S.W. is a developmentally disabled adult and resident of the City of Turlock located within County of Stanislaus, California. S.W. is an adult special education student who is an individual with exceptional needs within the meaning of that term under California Education Code § 56026. S.W. is an individual with mental impairments that substantially limited many major life activities within the meaning of 34 C.F.R. § 104.3(j). S.W. is entitled to be free from discrimination based on her disability.

4. Sandra Drumonde ("Ms. Drumonde") is the legal guardian and proposed Guardian ad Litem of S.W. Ms. Drumonde at all times relevant herein, was, and continues to be, a resident of Turlock, California.

5. Defendant Turlock Unified School District ("Turlock") is a public entity duly incorporated and operating under California law as a school district. Turlock is a public entity and recipient of federal financial assistance subject to the requirements of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

6. In enacting Title II of the Americans with Disabilities Act, Congress validly abrogated state sovereign immunity, and thus Turlock may be sued pursuant to Title II. *Hanson v. Med. Bd. Of California*, 279 F.3d 1167, 1170 (9th Cir. 2002). By accepting federal funds, Turlock waived its sovereign immunity under the Eleventh Amendment to claims brought pursuant to Section 504 of the Rehabilitation Act of 1973. *Pugliese v. Dillenberg*, 246 F.3d 937 (9th Cir. 2002).

## PROCEDURAL BACKGROUND

7. On August 27, 2019, Ms. Drumonde requested a due process hearing with the Office of Administrative Hearings ("OAH"). The due process hearing alleged that Turlock and Modesto City Schools ("Modesto") violated S.W.'s rights to a free appropriate public education.

8. In December of 2019, the due process hearing commenced with respect to a statute of limitations issue against Modesto only. S.W. has yet to receive a decision with respect to

2

the statute of limitations issue. That decision has no bearing on this case.

9. In January of 2020, Ms. Drumonde and Turlock entered into a settlement agreement whereby Turlock agreed to not assert exhaustion of administrative remedies as an affirmative defense in any subsequent civil action[1] brought on behalf of S.W.

10. Furthermore, Turlock agreed to file a joint stipulation waiving exhaustion as an affirmative defense prior to filing responsive pleadings.

**FACTUAL ALLEGATIONS**

11. S.W. is a young adult special education student with Autism. S.W.'s Autism impacts her in all areas of development, including though not limited to, the ability to communicate, socialize, adaptive functioning, academics, sensory processing, and behavior.

12. S.W.'s significant developmental needs as a student with Autism have been ignored and unmet. As discussed below, the public education system warehoused S.W. at home while providing almost no services to address her educational and developmental needs.

13. At all times relevant herein, S.W. required Autism related behavior services in the form of applied behavioral analysis ("ABA"). The American Academy of Pediatrics and the National Research Council have endorsed ABA as the most effective form of treatment for autism. ABA is the process of applying interventions based upon the principles of learning theory to improve socially significant behaviors.

14. At no point during the time period captured in this complaint did S.W. ever receive a functional behavioral assessment ("FBA") despite behaviors significantly impacting her ability to learn—let alone leave her house. In fact, there is almost no useful assessment data regarding S.W. and her ability levels in her entire educational file. An FBA is a process that identifies specific target behaviors, the function of the behavior, and what

[1] In the IDEA context, such federal claims are subject to the IDEA's exhaustion requirement under 20 U.S.C. § 1415(*l*). This exhaustion requirement, however, is not jurisdictional. *See Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867–71 (9th Cir. 2011) ("Section 1415 is written as a restriction on the rights of plaintiffs to bring suit, rather than as a limitation on the power of the federal courts to hear the suit. That textual choice strongly suggests that the restriction may be enforced by defendants but that the exhaustion requirement may be waived or forfeited."), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014).

factors maintain the behavior that ultimately interferes with a student's educational progress. An FBA is a commonly used tool in public education and not a novel assessment.

15. In general, non-disabled students attend school sites for approximately six hours per day of instruction with highly qualified teachers. In addition, non-disabled peers are able to socialize at school by having access to recess, lunch, and other extra circular activities. As discussed herein, S.W. was provided nothing close to what her non-disabled peers received.

16. When S.W. was eight years old, she resided with her mother in Oregon. S.W.'s school district did not know how to handle her behavior so they placed her in a rifton chair for the majority of the school day because she was injuring staff and other students. The chair was designed so S.W. could not get out though she was able to thrash around injuring herself. Eventually, S.W. began to fear attending school.

17. In 2013, Ms. Drumonde relocated back to California to seek better services for her two children with Autism.

18. When S.W. returned to California, she was enrolled in Empire Union School District. For about a three-week period of time, S.W. attempted to attend a school site called "JFK." However, S.W. began to say, "no JFK" or "JFK hurt" and refused to attend. Ms. Drumonde struggled to get S.W. out of the home. Even if Ms. Drumonde could get S.W. to the car, she would refuse to get out of the car or attempt to exit the car when it was moving. This was the last time S.W. attended a school campus.

19. Because S.W.'s behavior impacted her ability to attend school, S.W. was provided only thirty minutes or less per day of home instruction—far less instruction than her non-disabled peers. For much of that time, Ms. Drumonde was told thirty minutes per day was all S.W. could receive because she was educated at home.

///

///

4

**2017-2018 School Year**

20. During the 2017-2018 school year, S.W. was in the eleventh grade and was enrolled in Turlock.

21. At the time S.W. transferred into Turlock, she refused to leave her home. Turlock placed S.W. on "home instruction." Turlock made no attempt to evaluate S.W. to determine what supports she might require.

22. S.W. never attended any school site nor was she provided access to an educational setting similar to her non-disabled peers. Instead, S.W. was warehoused in her home and provided approximately *thirty minutes* per day of home instruction. However, S.W.'s home instruction was nothing more than a teacher coming to her house on his lunchbreak to play social games with her (i.e. giving a high five). S.W. was not provided any meaningful instruction. During the majority of visits, the teacher sat on the couch and rarely interacted with S.W. in a meaningful manner.

23. Ms. Drumonde requested help to get S.W. back to school at multiple IEP meetings. Turlock ignored these requests.

24. S.W. required an intensive behavior program based on the principles of ABA aimed at getting her out of the house and back onto a school campus. Despite what was an obvious need, Turlock did nothing.

25. S.W. required a functional behavior assessment to develop a plan to get S.W. out of the house and back onto a school campus. Despite what was an obvious need, Turlock did nothing.

26. Turlock refused to even set up a desk or an area where S.W. could do schoolwork in her home. When Ms. Drumonde requested Turlock provide a desk, they said no.

27. S.W. was not provided with a free appropriate education. Turlock failed to offer S.W. special education and related services that were designed to meet her educational needs as adequately as the needs of her nonhandicapped peers.

///

28. During this period of time, S.W. received several hours per day of intense behavior services (ABA) provided through her private insurance. S.W. was capable of accessing several hours per day of school instruction and services. However, Turlock made no effort to provide S.W. with anything beyond the thirty minutes per day of home instruction despite a clear and obvious needs for such services.

29. During the 2017-2018 school year, S.W. never left her home, received minimal educational services, and continued to fall further and further behind in all areas of development.

30. Ms. Drumonde was also trapped in her own home. S.W. could not leave her home because of the lack of appropriate supports and services. Ms. Drumonde could not leave S.W. alone and was forced to become her full-time caregiver while other similarly aged students went to school for a full day.

31. S.W. sat at home for the entire school year receiving little meaningful instruction. Moreover, S.W.'s inability to leave her home caused her to suffer from health issues in addition to rotting teeth, which became life threatening the following school year.

32. Based on information and belief, Turlock instructed all of S.W.'s teacher to mark her present in class despite her not being at a school site. As a result, S.W. received a "P" for passing in the following classes each and every semester: functional language arts, functional math, functional science, physical education, and functional social studies. However, S.W. was not provided with instruction with any of these subjects. It is believed Turlock marked S.W. present so they could continue to collect full funding for her attendance despite providing her with almost no educational services whatsoever.

### 2018-2019 School Year

33. During the 2018-2019 school year, S.W. was in the twelfth grade and was enrolled in Turlock.

34. S.W. never attended any school site nor was she provided access to an educational setting similar to her non-disabled peers. Instead, S.W. was warehouse in her home and provided

approximately *thirty minutes* per day of home instruction. However, S.W.'s home instruction was nothing more than a teacher coming to her house on his lunchbreak to play social games with her (i.e. giving a high five). S.W. was not provided any meaningful instruction. During the majority of visits, the teacher sat on the couch and rarely interacted with S.W. in a meaningful manner.

35. Ms. Drumonde continued to request help to get S.W. back to school at multiple IEP meetings. Turlock ignored these requests.

36. S.W. continued to require an intensive behavior program based on the principals of ABA aimed at getting her out of the house and back onto a school campus. Despite what was an obvious need, Turlock did nothing.

37. S.W. continued to require a functional behavior assessment to develop a plan to get S.W. out of the house and back onto a school campus. Despite what was an obvious need, Turlock did nothing.

38. Turlock continued to refused to set up a desk or an area where S.W. could do schoolwork in her home. When Ms. Drumonde requested Turlock provide a desk, they said no.

39. S.W. was not provided with a free appropriate education. Turlock failed to offer S.W. special education and related services that were designed to meet her educational needs as adequately as the needs of her nonhandicapped peers.

40. During this period of time, S.W. received several hours per day of intense behavior services provided through her private insurance. S.W. was capable of accessing several hours per day of school instruction and services. However, Turlock made no effort to provide S.W. with anything beyond the thirty minutes per day of home instruction despite a clear and obvious needs for such services.

41. During the 2018-2019 school year, S.W. never left her home, received minimal educational services, and continue to fall further and further behind in all areas of development.

///

42. Ms. Drumonde continued to be trapped in her own home. S.W. could not leave because of the lack of appropriate supports and services. Ms. Drumonde could not leave S.W. alone and was forced to become her full-time caregiver while other similarly aged students went to school for a full day.

43. S.W. sat at home for the entire school year receiving little meaningful instruction. Moreover, S.W.'s teeth began to rot eventually leading to weeks of fevers and pain. However, Ms. Drumonde could not get S.W. to a doctor to receive the medical attention she required because her behavior would escalate. S.W. spent the majority of the twelfth grade in extreme oral pain. Had Turlock provided the appropriate supports and services, S.W. would have been able to leave her house and go to a doctor. Instead, Sophia's refusal to leave her home was intensified by Turlock's deliberate indifference to her obvious needs.

44. Based on information and belief, Turlock instructed all of S.W.'s teacher to mark her present in class despite her not being at a school site. As a result, S.W. received a "P" for passing in functional language arts, functional math, functional science, physical education, and functional social studies. However, S.W. was not provided with instruction with any of these subjects. It is believed Turlock marked S.W. present so they could continue to collect full funding for her attendance despite providing her with almost no educational services whatsoever.

**2019-2020 School Year[2]**

45. During the 2019-2020 school year, S.W. became an adult transition aged student and was enrolled in Turlock.

46. Turlock provide S.W. with no home instruction whatsoever for the majority of the first half of the school year.

47. Ms. Drumonde began to get phone calls that her daughter was being marked absent at school. Ms. Drumonde was confused because S.W. had not attended a school site in many

[2] S.W. and Ms. Drumonde are not asserting claims beyond January 1, 2020.

years.

48. Based on information and belief, Turlock instructed all of S.W.'s teacher to mark her present in class despite her not being at a school site. As a result, S.W. received a "P" for passing in functional language arts, functional math, functional science, physical education, and functional social studies. However, S.W. was not provided with instruction with any of these subjects. It is believed Turlock marked S.W. present so they could continue to collect full funding for her attendance despite providing her with almost no educational services whatsoever.

49. Ms. Drumonde continued to request help to get S.W. back to school at multiple IEP meetings. Turlock ignored these requests.

50. S.W. continued to require an intensive behavior program based on the principals of ABA aimed at getting her out of the house and back onto a school campus. Despite the obvious, Turlock did nothing.

51. S.W. continued to require a functional behavior assessment to develop a plan to get S.W. out of the house and back onto a school campus. Despite the obvious, Turlock did nothing.

52. Turlock did finally offer to provide S.W. with a desk at home. However, S.W. did not have a teacher to go with the desk.

53. S.W. was not provided with a free appropriate education. Turlock failed to offer S.W. special education and related services that were designed to meet her educational needs as adequately as the needs of her nonhandicapped peers.

54. During this period of time, S.W. received several hours per day of intense behavior services provided through her private insurance. S.W. was capable of being provided several hours per day of school instruction and services. However, Turlock made no effort to provide S.W. with anything beyond the thirty minutes per day of home instruction despite a clear and obvious need for such services.

///

55. During the first half of the 2019-2020 school year, S.W. never left her home, received minimal educational services, and continued to fall further and further behind in all areas of development.

56. Ms. Drumonde continued to be trapped in her own home. S.W. could not leave because of the lack of appropriate supports and services. Ms. Drumonde could not leave S.W. alone and was forced to become her full-time caregiver while other similarly aged students went to school for a full day.

## FIRST CLAIM FOR RELIEF

### *Violation of § 504 of the Rehabilitation Act of 1973*

### (Defendant, DISTRICT)

57. Plaintiff refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

58. Plaintiff is informed and believes, and on that basis alleges, that Turlock is, and at all relevant times, was a recipient of federal funds, and that part of those funds were used in the operations, construction and/or maintenance of the specific public facilities and programs described herein and the activities that take place therein.

59. S.W. is a qualified individual with a disability. S.W. has autism which substantially limits his major life activities of, *inter alia*, communication, school performance, and social and emotional functioning.

60. By its actions or inactions in denying meaningful and equal access to educational services, Turlock discriminated against S.W. by failing to provide an appropriate education (including supports, services, and placement) pursuant to 34 C.F.R. § 104.33. As a result, Turlock violated S.W.'s rights under Section 504 of the Rehabilitation Act of 1973.

61. By its actions or inactions, Turlock violated Section 504 of the Rehabilitation Act of 1973 by failing to afford S.W. an equal opportunity to participate in or benefit from the aid, benefit, and services provided by a public education in violation of 34 C.F.R. § 104.4. As a result, the Turlock violated S.W.'s rights under Section 504 of the Rehabilitation Act of

10

1973.

62. By its actions or inactions, Turlock violated Section 504 of the Rehabilitation Act of 1973 by denying S.W. the reasonable accommodations necessary to achieve meaningful access to her education.  S.W. required sufficient hours of instruction, an appropriately credentialed teacher, a one to one aide trained in applied behavior analysis, supervision by a board-certified behavior analysis, a functional behavior assessment, and a behavior support plan.  The failure to provide these obvious accommodations violated S.W.'s rights under Section 504 of the Rehabilitation Act of 1973.

63. The discrimination described herein constitutes a violation of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 749, et seq.), which provides that "no otherwise qualified individual with a disability shall, solely be the reason of his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

64. Turlock acted with deliberate indifference to S.W.'s rights under Section 504, as described herein, by knowingly failing to provide S.W. the supports and services she required to benefit from her education.  Moreover, S.W.'s required supports and services were clearly obvious to the casual observer.

65. As a direct and proximate result of Turlock's discrimination, S.W. suffered damages in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

*Violation of the Americans With Disabilities Act*

**(Defendant, DISTRICT)**

66. Plaintiff refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

67. At all relevant times, S.W. was entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990 ("Title II").  Title II, Subpart A prohibits discrimination by any "public entity," including any state or local

11

government, as defined by 42 U.S.C. § 12131, section 201 of the ADA. Turlock is a "public entity" and subject to Title II.

68. Pursuant to 42 U.S.C. § 12132, section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. S.W. was at all times relevant herein a qualified individual with a disability as defined herein.

69. By its actions or inactions in denying equal access to educational services, Turlock discriminated against S.W. by failing to provide an appropriate education to support S.W.

70. Turlock acted with deliberate indifference to S.W.'s rights under Title II, as descried herein, by knowingly failing to provide S.W. the supports and services she required to benefit from her education. Moreover, S.W.'s required supports and services were clearly obvious.

71. As a result of the Turlock's failure to comply with its duty under Title II, S.W. has suffered damages including special and general damages according to proof.

### **PRAYER FOR RELIEF**

72. Compensatory damages for S.W.'s injuries, psychological and emotional distress, and for any other damages as alleged herein in a sum according to proof;

73. Special damages in a sum according to proof against Defendant;

74. General damages in a sum according to proof against Defendant;

75. Injunctive relief in accordance with proof;

76. Attorneys' fees and costs of suit incurred herein; and

77. For such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: February 21, 2020

   /S/ DANIEL R. SHAW_____
Daniel R. Shaw
Attorney for Plaintiff

12